# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONSERVATION LAW FOUNDATION,

    Plaintiff,

       v.

PENNY PRITZKER, *et al.*,

    Defendants.

Civil Action No. 13-820 (JEB)

## MEMORANDUM OPINION

This administrative-law dispute illustrates the difficult balance that environmental regulators often must strike between species conservation and economic priorities. The controversy began in 2013, when the New England Fishery Management Council, a federal entity established by the Magnuson-Stevens Act, sought to prevent overfishing in the waters off the coast of the Northeast United States by reducing the allowable annual catch for local fishermen. As one would expect, this reduction put a burden on the region's fishing industry. To ease that burden, the Council promulgated "Framework 48," an adjustment to the relevant Fishery Management Plan, which, among other things, allowed local fishermen to apply for permission to enter areas that had previously been closed to commercial fishing. That provision of Framework 48 is the subject of this litigation.

Conservation Law Foundation, an environmental-advocacy group based in Boston, feared that opening the closed areas to fishing would threaten fish habitats and further degrade the region's ecosystem. It therefore filed this suit against Commerce Secretary Penny Pritzker, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service, challenging their acknowledged decision to trade off long-term environmental health for short-

term economic gain.  CLF claims that Framework 48's opening of the closed areas violates two different federal statutes.  First, the group argues that the Magnuson-Stevens Act and its implementing regulations required Defendants to use a more formal process to open the closed areas and to conduct more intensive analyses on the impact that the openings would have on the particular fishery.  Second, CLF contends that the National Environmental Policy Act required Defendants to produce a more detailed environmental analysis before they promulgated Framework 48.  In response, Defendants maintain that this case is not ripe for review, and that even if it were, they have complied with their obligations under both the MSA and NEPA.  Both sides have now cross-moved for summary judgment.

Although CLF makes some interesting arguments, they ultimately fall short.  While the Court agrees that the group's MSA claim is ripe, the process Defendants used to promulgate Framework 48 and the supporting analyses were perfectly sufficient under the requirements of that law.  CLF's NEPA claim, by contrast, is not yet ripe for review.  The Court will therefore grant Defendants' Motion.

## I.       Background

The regulatory scheme at issue in this case is both technical and complex, and this Court has already had occasion to review it in great detail – twice.  See Oceana, Inc. v. Pritzker, No. 13-770, 2014 WL 616599 (D.D.C. Feb. 18, 2014); Oceana, Inc. v. Locke, 831 F. Supp. 2d 95 (D.D.C. 2011).  In addition, the Court is today issuing an Opinion in a related case, Conservation Law Foundation v. Pritzker, No. 13-821 (D.D.C. Apr. 4, 2014).  What ensues, therefore, is only a brief overview of the relevant background law, followed by a more focused analysis of the precise legal issues at stake here.

Congress passed the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.*,[1] to address the problem of overfishing in U.S. waters.  See Oceana, 2014 WL 616599, at *1.  The Act seeks to "balance[] the twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to thrive," and it assigns this task to the Secretary of Commerce, who in turn has delegated the responsibility to the National Marine Fisheries Service.  Id.; see also 16 U.S.C. §§ 1801(b), 1802(39).  To that end, the Act establishes eight regional Fishery Management Councils, each of which is charged with drawing up Fishery Management Plans to govern the different fisheries under its control.  See Oceana, 2014 WL 616599, at *1-2; see also 16 U.S.C. §§ 1852(a) & (h).  The Councils and the Service can update Plans by adopting either "Amendments, which alter Plans in broad strokes," or "Framework Adjustments, which are expedited changes that modify Plans in more modest ways."  Oceana, 2014 WL 616599, at *2 (citing 16 U.S.C. §§ 1853(c), 1854(a) & (b) and 50 C.F.R. § 648.90(c)).

This case deals with the Northeast Multispecies Fishery, one of the fisheries managed by the New England Fishery Management Council.  See id.; see also 16 U.S.C. § 1852(a)(1)(A).  The Northeast Multispecies Fishery Management Plan regulates that region's "groundfish" fishery, which includes species such as cod, haddock, and flounder.  See Oceana, 2014 WL 616599, at *2.  Prior to 2009, the Plan protected against overfishing though an "'input-based' management system, meaning [that] it limit[ed] the amount of time vessels spen[t] fishing – *i.e.*, their 'efforts' to catch fish."  Oceana, 831 F. Supp. 2d at 102; see also AR 1,292-1,307.  In 2009, however, the Council revised the Plan with "Amendment 16," which switched to an "output-based" management system, "hing[ing] not on fishing efforts, but on results – *i.e.*, the amount of fish caught."  Oceana, 831 F. Supp. 2d at 102-03; Amendment 16 at 1 (AR 382).  Amendment 16

[1] Title 16 of the U.S. Code was in the process of revision for the 2012 edition at the time of briefing, a process that has recently been completed.  To avoid confusion, the Court uses the version of the Code cited in the briefs – the 2006 edition.

also allowed fishermen to join a "sector," a cooperative group of fishing vessels exempt from the input restrictions and subject only to a hard limit on its output – *i.e.*, the total amount of each stock of fish that it could catch each year.  Amendment 16 at 9 (AR 390).

Even after Amendment 16, however, the Plan maintained that certain input restrictions would continue to apply to all fishers, whether or not they joined a sector.  One such restriction, at issue in this case, is the limit imposed by the fishery's "year-round closure areas."  50 C.F.R. 648.87(c)(2)(i).  In certain "closed" areas of the fishery, fishing is strictly limited or even entirely prohibited.  Framework Adjustment 48 at 123 (AR 26,164).  Closed areas "protect[] a segment of the [fish] stock" and also "specifically enhance" those "ecosystem and stock characteristics [that] affect groundfish productivity."  Framework Adjustment 48 at 363 (AR 26,404).  Amendment 16 made clear that while all sectors would be automatically exempt from a range of input restrictions, and while they could apply on a case-by-case basis for special exemptions from others, <u>no</u> sector could request or receive an exemption from certain specifically listed restrictions, first among them the limits on fishing in the closed areas.  <u>See</u> Amendment 16 at 118 (AR 499); 50 C.F.R. § 648.87(c)(2)(i).  Amendment 16 nevertheless also allowed the list of restrictions for which no exemptions could be given to itself be modified through a subsequent Framework Adjustment.  <u>See</u> Amendment 16 at 118 (AR 499); 50 C.F.R. § 648.87(c)(2)(i).

In 2013, the Council took up the sword and promulgated Framework 48, which removed the closed areas from the list of restrictions for which no sector exemptions could be granted. <u>See</u> 78 Fed. Reg. 26,118 (May 3, 2013) ("Framework Adjustment 48 Interim Final Rule"); 78 Fed. Reg. 53,363 (Aug. 29, 2013) ("Framework Adjustment 48 Final Rule").  Now, a sector could "request an exemption from the prohibition in fishing in year[-]round closed areas" subject to certain limitations.  Framework Adjustment 48 at 60-62 (AR 26,101-03).  The Council

proposed this change because catch limits for sectors would be reduced in 2013, see Framework Adjustment 48 at 62 (AR 26,103), and it hoped to "provide the industry with additional fishing grounds during a time of low stock allocations." Id. at 8 (AR 26,049). At the same time, the Council acknowledged that this decision "require[d] weighing short-term gains against long-term losses in productivity." Id. at 363 (AR 26,404). Although the Service approved Framework 48, it emphasized that it "must still decide which, if any, exemptions [to the limits on fishing in closed areas] will be granted, and, if granted, whether seasonal, area, gear or other types of limitations are necessary to ensure any exemption will be consistent with . . . the groundfish [Fishery Management Plan] and the Magnuson-Stevens Act." 78 Fed. Reg. at 26,144.

Concerned that opening the closed areas to fishers might spoil those areas and the rest of the fishery, CLF sued, claiming that this aspect of Framework 48 violated the regulatory scheme established by the MSA and NEPA. See 42 U.S.C. § 4321 *et seq.* CLF has moved and Defendants have cross-moved for summary judgment. The Court now turns to the arguments proffered by each side.

## II. Legal Standard

Challenges under the MSA and NEPA proceed under the Administrative Procedure Act's familiar "arbitrary and capricious" standard of review. See 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A); Baltimore Gas and Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97-98 (1983); see also Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). Because of the limited role federal courts play in reviewing such administrative decisions, the typical Federal Rule 56 summary-judgment standard does not apply to the parties' dueling Motions. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006) (citing Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005)). Instead, in APA,

MSA, and NEPA cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this "narrow" standard of review – which appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) – an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). In other words, courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. Citizenship and Immigration Services, 596 F.3d 1115, 1118 (9th Cir. 2010).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003). The reviewing court "is not to substitute its judgment for that of the agency," id., nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Americans for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and citation omitted). A decision

that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

## III.    Analysis

CLF has put forward two main challenges to Framework 48.  First, it says that the Framework violates the MSA and its implementing regulations because it makes changes that can only be implemented via Amendment, rather than Framework Adjustment, and because it contains insufficient analyses of the impact that opening the closed areas will have on the fishery's ecosystem.  Second, it argues that Defendants failed to perform the environmental analysis NEPA requires in order to undertake these actions.  Before the Court addresses either of those issues, however, it must first resolve Defendants' assertions that CLF lacks standing to bring this suit and that its claims are not ripe for review.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-101 (1998) (explaining that standing is matter of Article III jurisdiction and must be resolved before federal court may reach merits of case).  After determining that CLF has standing but only its MSA claim is ripe, the Court will turn to the merits of the surviving claim.

### A.  Jurisdictional Issues

As this Court recently observed, "Not every disagreement merits a lawsuit."  Scenic Am. v. Dep't of Transp., 2013 WL 5745268, at *3 (D.D.C. Oct. 23, 2013).  The Constitution empowers federal courts to decide only "cases or controversies," a phrase given meaning by the doctrine of "standing."  See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990); U.S. Const. art. III.  To have standing to sue in federal court, a plaintiff must establish that: (1) it has suffered a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical;

(2) there is a causal relationship between its injury and the defendant's conduct; and (3) it is likely that a victory in court will redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

As an organizational plaintiff, CLF may have standing to sue both on its own behalf, known as "organizational standing," and also on its members' behalf, which is called "representational standing." See Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132 (D.C. Cir. 2006). In this case, CLF claims representational standing to sue on behalf of two members who fish in the Northeast Multispecies Fishery and who fear that opening the closed areas will deplete the area's stocks, causing them recreational, economic, and aesthetic harm. See Pl. Mot., Exh. 1 (Declaration of Captain William Redington Tower, III), ¶ 6; Exh. 2 (Declaration of Peter Shelley), ¶¶ 20-23.[2]

Closely related to the standing question is the "ripeness" doctrine. This "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbot Labs. v. Gardner, 387 U.S. 136, 148-49 (1967). The doctrine consists primarily of a two-part inquiry, in which the Court examines both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). When a court is reviewing agency action, "the primary focus of the ripeness doctrine . . . [is] a prudential attempt to time review in a way that balances the petitioner's interest in prompt consideration of

---

[2] In its Motion, CLF explains that "[s]upport for CLF's standing in this case is set forth in the Memorandum in support of Motion for Summary Judgment filed concurrently with this memorandum in the companion case, Conservation Law Foundation v. Pritzker, 1:13-cv-00820-JEB. CLF incorporates the points and authorities set forth in that document here as if fully set forth." Given that this case is numbered 13-820, the Court presumes that CLF intended to refer to the companion case, Conservation Law Foundation v. Pritzker, numbered 13-821.

allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." Eagle-Picher Indus. v. EPA, 759 F.2d 905, 915 (D.C. Cir. 1985).

Defendants do not contest CLF's claim that its members would be harmed by the opening of the closed areas. Nor do they dispute that such a harm would be caused by Framework 48 and redressable by victory in this case. Instead, Defendants challenge the imminence of CLF's claimed harm, emphasizing that because Framework 48 does not itself grant fishermen the right to enter closed areas – it merely empowers the Service to do so – "CLF has brought an abstract, speculative challenge to a mere delegation of authority." Def. Mot. at 6. In other words, according to Defendants, until the Service actually exercises the authority conferred by Framework 48 and grants an exemption to a sector seeking to fish in a closed area, CLF's membership has not suffered any injury-in-fact. As a result, Defendants say, CLF lacks standing to sue and its claims are not ripe.

   *1. Standing*

 The Court begins with standing. Ironically, for all the debate over whether CLF's challenge to Framework 48 is too speculative, the Service actually did open several closed areas to fishing in December 2013 – just a few months after CLF filed this suit. See 78 Fed. Reg. 41,772-80 (July 11, 2013) (proposed rule); 78 Fed. Reg. 76,077 (Dec. 16, 2013) (final rule). That decision, however, cannot form the basis for CLF's standing to sue because "standing is to be determined as of the commencement of the suit," Lujan, 504 U.S. at 571-72 n.5, and "may not be established by a development that occurs after the commencement of the litigation." Park v. Forest Serv. of U.S., 205 F.3d 1034, 1037-38 (8th Cir. 2000); see also Kitty Hawk Aircargo, Inc.

v. Chao, 418 F.3d 453, 458 (5th Cir. 2005); <u>Perry v. Village of Arlington Heights</u>, 186 F.3d 826, 830 (7th Cir. 1999).  This means that the Court must evaluate whether CLF had standing to sue based on the facts as they existed when the group filed its Complaint on May 31, 2013, and cannot consider Defendants' subsequent actions.

As mentioned earlier, Defendants appear to concede that the opening of the closed areas would have given CLF standing to sue if this had occurred before CLF filed its Complaint. Indeed, Defendants even suggest that CLF could cure its alleged lack of standing here by amending its Complaint to include the Service's December 2013 decision.  <u>See</u> Def. Mot. at 8. Although CLF declined that invitation, it did file a separate suit on January 15, 2014, challenging the December 2013 decision.  <u>See</u> Compl., <u>Conservation Law Found. v. Pritzker</u>, No. 14-58 (D.D.C. Jan. 15, 2014).

The Court agrees that the economic, recreational, and aesthetic harm that CLF says would result from opening the closed areas is "undeniably a cognizable interest for purpose of standing," <u>Lujan</u>, 504 U.S. at 562-63; <u>see also</u> <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 182-83 (2000), and that it is equally undeniable that such harm would be caused by Defendants' actions and redressable by victory in this case.  As was just explained, however, in May 2013, when this suit was filed, no closed areas had yet been opened, and CLF had thus not yet suffered any harm.  The question, then, is whether at that time, CLF's claimed harm from the closed-area openings was "actual or imminent," rather than "conjectural or hypothetical."  <u>Lujan</u>, 504 U.S. at 560 (internal quotation marks omitted).  It may seem strange to ask such a question when the passage of time has made the answer obvious – the Service opened the closed areas to fishing just six months after CLF filed its Complaint – but this is the kind of mental contortion that the law sometimes demands.

Although Framework 48 did not itself open any closed areas to fishing, the Court finds that Defendants' decision to allow exemptions to the closed-area rules posed a sufficiently imminent threat to satisfy Article III.  The D.C. Circuit dealt with a very similar situation in Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43 (D.C. Cir. 1999).  There, a coalition of environmental groups challenged the Forest Service's authorization of oil and gas leasing in the Shoshone National Forest, which they claimed violated both the agency's own regulations and NEPA.  See id. at 45-47.  Although the group representing the coalition filed its suit "before any leases had actually been issued," and in fact "there [was] no certainty that drilling [would] commence on the disputed lands," the court still found that the plaintiff had standing to sue because "the procedural barrier which [Plaintiff] alleges to have been breached no longer stands in the way.  The land of concern is in genuine danger. . . . [T]he impending threat of injury is sufficiently real to constitute injury-in-fact."  Id. at 50-51.  The situation in this case is the same: Although CLF filed its suit in May 2013, before any exemptions had actually been granted, CLF still had standing to sue because the procedural barrier it alleged to have been breached – Amendment 16's bar on the granting of exemptions to the closed-area restrictions – no longer stood in the way.  The area of concern was in genuine danger, which created a threat of harm sufficiently imminent to constitute injury-in-fact.  CLF therefore has standing to bring this suit.

> ### 2.  Ripeness

The Court next addresses whether CLF's claims are ripe for review.  Although it has already found that the group satisfies the "case or controversy" requirement of Article III, "the ripeness requirement dictates that courts go beyond constitutional minima and take into account

prudential concerns which in some cases may mandate dismissal even if there is not a constitutional bar to the exercise of [federal] jurisdiction." Id. at 48.

Once again, Wyoming Outdoor is instructive. There, as here, the plaintiff brought two distinct challenges to the Forest Service's decision to authorize oil and gas leasing in the Shoshone. The first was a procedural challenge, which alleged that the Forest Service had failed to make certain factual findings required by statute before it identified what land would be made available for leasing. See id. at 51-52. That claim parallels CLF's procedural challenge alleging that Defendants used the wrong process to recategorize the closed-area restrictions and neglected to perform the proper analyses before making that decision. The second objection was a NEPA claim, arguing that the Forest Service had not included certain required findings in its Environmental Impact Statement. See id. at 47. In this case, too, CLF contends that Defendants violated NEPA by failing to conduct a sufficient review of the potential environmental impact of Framework 48. Faced with this closely analogous set of circumstances, the Wyoming Outdoor panel found that the plaintiff's first (procedural) claim was ripe for review but that its second (NEPA) one was not. Given that the instant case essentially mirrors that one, the Court is bound to reach the same outcome. In doing so, it will address the two claims in reverse order for ease of analysis.

a. NEPA Claim

Beginning with CLF's NEPA claim, the Court finds that the issue is not yet ripe for review. A bit of background first: NEPA requires federal agencies to prepare a detailed "Environmental Impact Statement" whenever they propose any "major . . . actions significantly affecting the quality of the human environment." Dep't of Transp. v. Public Citizen, 541 U.S. 752, 757 (2004) (quoting 42 U.S.C. § 4332(2)(C)). For less consequential actions, NEPA

permits agencies to produce a more concise "Environmental Assessment." Id. (citing 40 C.F.R. §§ 1501.4(a)-(b)). In this case, Defendants prepared only an EA, which CLF claims was insufficient in light of the fact that opening the closed areas to commercial fishermen might have a significant impact on the environment.

As the D.C. Circuit explained in Wyoming Outdoor, however, a NEPA claim such as this one requires the plaintiff to show that the agency has made an "irreversible and irretrievable commitment of resources" in order to establish ripeness, "whether or not [the plaintiff] has established the element of injury redressable in [the] litigation necessary to establish standing." Wyoming Outdoor, 165 F.3d at 49. The panel derived this rule from its assessment of "the purpose of NEPA," which, the panel presumed, would not require an agency "to delay its undertakings and commit its resources to the preparation of an EIS which might ultimately prove unnecessary." Id. Because the plaintiff had "brought its NEPA action before any leases had actually been issued," the Wyoming Outdoor court concluded that "the point of irreversible and irretrievable commitment of resources" had not been reached – the Forest Service might end up deciding not to issue any leases at all or it might take additional steps to comply with its NEPA obligations. Id. at 50. It therefore dismissed the claim as premature.

The circumstances here are practically identical. CLF filed this case before any exemptions to the closed-area restrictions had been granted. Just like the Forest Service in Wyoming Outdoor would not reach "the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA . . . until leases are issued," so too is CLF's NEPA claim premature until Defendants have actually handed out exemptions for the closed-area access restrictions. Id. at 49. Although Defendants did grant such

exemptions several months after CLF filed its Complaint, the same was true in <u>Wyoming Outdoor</u>, and the panel still found the plaintiff's NEPA claim unripe:

> [Plaintiff has] raised the NEPA compliance issue . . . in its administrative protest of the . . . offering of three Shoshone leases. However, that challenge would necessarily be a challenge to the state of the Forest Service's NEPA compliance <u>at the time of lease issuance</u>. The record before us is therefore incomplete since it represents the state of the Forest Service's NEPA compliance <u>at the time the Forest Service rendered its "specific lands" decision</u> [an earlier step in the lease-authorization process].

<u>Id.</u> at 50. Here, as in that case, the record for CLF's NEPA challenge is incomplete, since it represents the state of Defendants' NEPA compliance at the time that they promulgated Framework 48, not at the time of an exemption grant. The Court therefore cannot decide the issue at this juncture.

It is telling that CLF makes practically no effort to distinguish its NEPA claim from the one in <u>Wyoming Outdoor</u>, merely insisting that "[t]his is not an abstract licensing scheme that lacks sufficient contours to perform a thorough NEPA review." Pl. Reply at 14. But CLF fails to explain how the licensing scheme in <u>Wyoming Outdoor</u> was any more "abstract" or lacking in "sufficient contours" than the closed-area-exemption scheme at issue here, and, indeed, the Court sees no principled basis on which to differentiate between the two. In sum, just as the D.C. Circuit instructed that the <u>Wyoming Outdoor</u> plaintiff could "challenge the Forest Service's NEPA compliance" only after "the leases were issued," CLF may challenge Defendants' NEPA compliance only after they have granted a sector an exemption to the closed-area access limitations. <u>Wyoming Outdoor</u>, 165 F.3d at 50. As of the filing of CLF's Complaint, therefore, its NEPA claim was unripe.

b.  MSA Claim

CLF's MSA challenge, by contrast, is currently ready for review.  In <u>Wyoming Outdoor</u>, the D.C. Circuit dismissed the plaintiff's NEPA allegation but permitted its procedural claim to go forward because "[u]nlike its NEPA claim, [Plaintiff's] procedural claim has become 'concrete and final,' since there no longer exists the possibility that further agency action will alter the claim in any fashion."  <u>Id.</u> at 51 (citation omitted).  The court explained that "[w]hile the Forest Service may undertake further efforts to comply with NEPA" or might never actually issue any licenses, "it ha[d] completely and finally implemented its procedures under [the regulation that the plaintiff claimed had not been followed]."  <u>Id.</u>  Drawing on the Supreme Court's admonition that "'a person with standing who is injured by a failure to comply with [some procedural requirement] may complain of that failure at the time the failure takes place, for the claim can never get riper,'" the panel concluded that the plaintiff's "claim that the Forest Service procedures violate its own regulations 'can never get riper'" and was therefore ready for review.  <u>Id.</u> (quoting <u>Ohio Forestry</u>, 523 U.S. at 737) (alteration in original).

The same is true here.  Defendants have "completely and finally implemented [their] procedures" under the MSA, <u>id.</u>, which CLF claims were violated because Defendants used a Framework Adjustment rather than an Amendment and because they conducted insufficient analyses before making their decision.  Since CLF was threatened with injury by Defendants' failure to comply with those procedural requirements, it "may complain of that failure at the time the failure [took] place, for the claim can never get riper."  <u>Id.</u> (quoting <u>Ohio Forestry</u>, 523 U.S. at 737).

In opposition, Defendants ask the Court to defer this facial challenge to Framework 48 and wait to adjudicate a direct challenge to the granting of a specific closed-area exemption.

They urge the Court to see "[w]hat exemptions will be granted and what the terms of those exemption[s] will be." Def. Mot. at 7. The reality, however, is that those facts have zero bearing on the substance of CLF's arguments, which turn on the process and analyses used to promulgate Framework 48, not on the particular exemptions that the Service may grant under the authority it conferred. Dismissing CLF's challenge in favor of one directed toward a specific grant of a closed-area exemption, then, does not assist in the resolution of this case.

Defendants invoke <u>Oceana, Inc. v. Evans</u>, 384 F. Supp. 2d 203 (D.D.C. 2005), in support of their argument, but, in fact, that case, even if it were binding, illustrates precisely why this one is ripe for review. In <u>Oceana</u>, the plaintiff alleged that an Amendment to the Atlantic Sea Scallop Fishery Management Plan violated the MSA because it expanded too greatly the list of changes to the FMP that the Council could make via Framework Adjustment, rather than Amendment. <u>See id.</u> at 248-50, 253-54. The court there concluded that the matter was not yet ripe: Because no changes to the FMP had actually been made at the time the suit was filed, and because some changes to the FMP could be made via Framework Adjustment consistent with the MSA, the court was "simply not in a position to know if Amendment 10 has unlawfully delegated an excessive amount of authority to the framework process, especially where this authority has yet to be exercised, and may, for all we know, not be used for many of the listed measures." <u>Id.</u> at 254. Citing a specific example, the court noted that the plaintiff had challenged a provision of Amendment 10 that allowed the Council to make changes to the FMP's "sea sampling" rules via Framework Adjustment, which the plaintiff claimed could only be made via Amendment. But because even the plaintiff conceded that very minor changes to the sea-sampling rules could be made via Framework Adjustment, and because the court did not yet know what kind of sea-sampling changes the Council would actually make, the court

determined that it would not "engage in hypothetical line-drawing to define exactly what framework actions regarding sea sampling [would] be unlawful." Id.

The situation here is quite different. In Oceana, the lawfulness of Amendment 10 turned on how the Council exercised the power delegated to it, and therefore waiting for the Council to actually exercise that power allowed the court to avoid deciding in the abstract precisely how far the agency could go without violating the law. In this case, by contrast, the consistency of Framework 48 with the MSA does not depend on what kind of closed-area exemptions the Council grants in the future – if CLF is right, then any exemption to the closed-area rules will violate the MSA. In other words, CLF's argument, unlike that of the Oceana plaintiff, does not "depend[] on the nature of a future . . . action" by the Council. Id. In sum, because "there no longer exists the possibility that further agency action will alter [CLF's] claim in any fashion," the MSA issue here "can never get riper" and is ready for review. Wyoming Outdoor, 165 F.3d at 51 (quoting Ohio Forestry, 523 U.S. at 737) (internal quotation marks omitted).

The Court finds, moreover, that delaying review of CLF's MSA claim would cause hardship to the group and force the Court to engage in unnecessary adjudication. More specifically, if the Court held off on deciding this issue and waited for a direct challenge to the Council's grant of a closed-area exemption, the litigation would proceed as follows: The Court would dismiss this case without prejudice; CLF's challenge to the December 2013 exemption grant, which it has already filed, see Complaint, Conservation Law Foundation v. Pritzker, No. 14-58, (D.D.C. filed Jan. 15, 2014), would also almost certainly be dismissed as moot once the December grant expires at the end of this fishing year on April 30, 2014, see 78 Fed. Reg. 76,077; CLF would then file a new MSA challenge to whatever closed-area exemptions the Council grants for the fishing year beginning on May 1, 2014, and that case would provide the

vehicle for its objections to Framework 48.  Defendants concede that "the timing here is challenging," Def. Reply at 2, but they offer no good reason for why the Court should force CLF to jump through so many additional hoops and wait so much longer to resolve a case that has already been fully briefed and served up on a platter for decision.  Although binding circuit precedent requires the Court to dismiss CLF's NEPA claim, the Court will not impose additional hardship on CLF by delaying the resolution of its MSA claim for another year to little or no benefit.

The Court, accordingly, will dismiss CLF's NEPA claim without prejudice and move on to the merits of its MSA challenge.

B.  <u>The Magnuson-Stevens Act</u>

CLF offers two theories for how Framework 48 violates the MSA and its implementing regulations.  First, the group posits that adjusting the FMP to include the closed-area access limitations as restrictions for which the Service may grant exemptions is too significant a change to be made by Framework Adjustment, and that instead it had to be made by Amendment.  Second, CLF contends that the Council did not engage in the analyses required by its own regulations before it promulgated Framework 48.  As the Court explains below, neither of these arguments carries the day.

1.  *Framework Adjustment v. Amendment*

In <u>Oceana, Inc. v. Evans</u>, the district court read the MSA to permit a "spectrum of permissible framework [adjustments]."  <u>Oceana</u>, 384 F. Supp. 2d at 252.  The <u>Oceana</u> court explained that Framework Adjustments could be used "for <u>some</u> types of measures" but that "certain features of fisheries management regimes <u>must</u> be specified by FMP" – in other words, via Amendment, rather than Framework Adjustment.  <u>Id.</u>  (citing 16 U.S.C. §§ 1801(b), 1853(a),

& 1855(f)(2)).  This is because the former is a more formal process while the latter requires less oversight.  See id. at 247-48.  "A framework adjustment that truly adjusts management measures according to specifications in the FMP," for instance, "might well be lawful, whereas so-called adjustments which in fact undermine or contravene key provisions of an FMP would not."  Id. at 254.  In sum, the Oceana court concluded that Framework Adjustments could "implement an FMP, but . . . not fundamentally alter it."  Id. at 255.

Neither CLF nor Defendants attempt to relitigate the proper boundaries of the Framework-Adjustment spectrum – both sides appear to accept the Oceana court's statement of the law on this issue, and both argue that they should prevail under that legal framework.  CLF says, for example, that Framework 48 goes too far for a Framework Adjustment because it "nullifies the prohibition against fishing in the . . . closed areas contained in" the Northeast Multispecies FMP, Pl. Mot. at 12, while Defendants rejoin that the FMP "expressly authorizes the Council to take this very action through a framework adjustment."  Def. Mot. at 9.  Although most of the relevant discussion in the Oceana decision is *dicta*, the Court finds its analysis persuasive; moreover, the Court is content to accept CLF's theory of the law for purposes of analysis, since, as explained below, CLF's challenge to Framework 48 fails even under its own proposed structure.

The sector system established by Amendment 16 allows fishermen who join sectors to "receive exemptions from many of the common pool effort control measures [input-based controls] in exchange for a sector [catch limit] for each species in the management plan [output-based controls]."  Amendment 16 at 9 (AR 390).  To organize that system, the Amendment creates three categories of input-based control measures: those from which sectors are universally exempt, those from which sectors can apply for individual exemptions, and those

from which sectors cannot apply for exemptions.  <u>See</u> Amendment 16 at 117-18 (AR 498-99).

The Amendment also provides that the Council may modify the third category of restrictions via

a Framework Adjustment.  The relevant language reads as follows:

> <u>The following list may be modified through a framework
> adjustment</u>.  Sectors <u>cannot</u> request exemption from the
> management measures included in this list[:]
> - Year round closed areas
> - Permitting restrictions . . .
> - Gear restrictions designed to minimize habitat impacts . . .
> - Reporting requirements.

<u>Id.</u> at 118 (AR 499) (first emphasis added).

As is apparent from this quotation, the express language of the FMP belies CLF's claim

that Framework 48 somehow "undermine[s] or contravene[s] key provisions" of the Plan.

<u>Oceana</u>, 384 F. Supp. 2d at 254.  On the contrary, the FMP <u>specifically states</u> that the Council

may alter the list of non-exemptible fishing restrictions, including the closed-area access

limitations, via Framework Adjustment.  The regulations implementing the FMP confirm that the

list of prohibited exemptions "may be modified through a framework adjustment," 50 C.F.R. §

648.87(c)(2)(i), which is precisely what Defendants did here.

Given this crystal-clear language, CLF's insistence that Framework 48 does not

"implement" the FMP, but instead somehow contradicts it, sounds an odd note.  CLF

nevertheless claims that the FMP "barely makes any reference to the opportunity to make a

framework adjustment to closed areas," Pl. Mot. at 9, and that "[i]f the public had reason to

believe that [the Council] and [the Service] intended to allow the entire groundfish fleet to apply

to for [*sic*] access into the existing year-round groundfish closed areas, there could have been an

outcry."  <u>Id.</u> at 12; <u>see also</u> Reply at 8.  But these are, one might say, red herrings.  CLF may

prefer a lengthier discussion or wish that it had understood the implications of the relevant

language sooner, but the FMP says what it says. The Council's decision to use the power conferred by Amendment 16 to shift the closed-area restrictions from the third category to the second plainly "adjusts management measures according to specifications in the FMP." Oceana, 384 F. Supp. 2d at 254. That is exactly what Framework Adjustments are intended to do.

Having lost this round, CLF takes its attack to the next level. Even if Framework 48 is consistent with the FMP, CLF suggests that the FMP itself contravenes the MSA by allowing the Council to make such a major revision via Framework Adjustment. "[C]losed areas are part of the management plan that advances core functions of preventing overfishing and protecting [essential fish habitat]," says CLF, and because "[t]his profound change to the Groundfish FMP is not the sort of ministerial or even discretionary act that Congress contemplated for a framework adjustment . . . [t]he fact that [the Council] and [the Service] purport to reserve to themselves the authority to do so [in the FMP]. . . does not cure their lack of power to do so." Pl. Reply at 9 (citations omitted). "Such core management measures," CLF concludes, "are required components of a fishery management plan" under the MSA "and are not intended to be created through framework adjustments." Pl. Mot. at 11. CLF also notes that the Service's own guidelines instruct that Framework Adjustments "are intended to describe future management actions, which would be implemented within a range as defined and analyzed in the FMP and associated analysis," id. at 9 (quoting NOAA Operational Guidelines for the Fishery Management Plan Process, available at, http://goo.gl/WIUqdK), but that the Northeast Multispecies FMP does not include any "range of analyzed or defined policy boundaries with respect to [the] closed area access mechanism" nor any "analysis or specification . . . with respect to the potential impacts that would be associated with allowing sectors broad access to the existing year-round groundfish closed areas." Id.

Defendants' initial rejoinder to this theory is that any challenge to the lawfulness of the FMP should have been brought in 2009, when Amendment 16 was approved, and that any such claim is now barred by the MSA's 30-day statute of limitations. See 16 U.S.C. § 1855(f)(1). The Court need not decide that question to dispose of CLF's argument, however, because even if this challenge were not time-barred, it would fail.

The MSA requires that "certain features of fisheries management regimes must be specified by FMP," Oceana, 384 F. Supp. 2d at 252, including measures to prevent overfishing and protect essential fish habitats. See 16 U.S.C. §§ 1853(a)(1)(A) & 1853(a)(6). CLF concedes, however, that the Northeast FMP "includes such statutorily required provisions, including a full identification and description of the groundfish closed areas that are now the subject of [Framework 48]." Reply at 7. Multiple federal courts, moreover, have "accepted that many fishery management measures are commonly enacted by framework action," Oceana, 384 F. Supp. 2d at 248 (collecting sources), including closed-area restrictions, see, e.g., Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004); Oceana, 384 F. Supp. 2d at 248; Conservation Law Found. v. Mineta, 131 F. Supp. 2d 19, 29-30 (D.D.C. 2001), and CLF offers no reason why closed-area restrictions should be treated any differently for this purpose. The Oceana court, furthermore, specifically rejected CLF's "very narrow" definition of a Framework Adjustment as intended only for "ministerial or . . . discretionary act[s]," 384 F. Supp. 2d at 251-53, instead suggesting that a Framework Adjustment should "adjust[] management measures according to specifications in the FMP," id. at 254, which is precisely what happened here. Although CLF hammers on the fact that the FMP did not include "guidance" or "discussion" on "how [closed-area access restrictions] can be removed through a simplified framework action," Pl. Reply at 7-8, the group cites no authority requiring it to provide such details. By describing a

system of sector exemptions and then expressly providing that certain of them, including closed-area access limitations, could be recategorized via Framework Adjustment, the Northeast FMP worked just as Congress intended.

In the face of all this countervailing law, CLF musters only a brief, bland appeal to the basic administrative-law principle that agencies should not be "permitted unbridled discretion," FCC v. Fox Television Stations, Inc., 556 U.S. 502, 536 (2009) (Kennedy, J., concurring); see also Whitman v. American Trucking Ass'ns, 531 U.S. 457, 485 (2001), coupled with an insistence that the relevant provision of the FMP here allows the Council "in practical effect, [to] rewrite[] the FMP itself." Pl. Reply at 9. But this is simply hyperbole. The entire point of Amendment 16, as explained earlier, was to encourage fishermen to join sectors by exempting them from many of the FMP's input restrictions; to that end, it created three categories of fishing restrictions and provided that the Council could alter the third category, which previously included the closed-area access limitations, via Framework Adjustment. That rather modest alteration, far from "rewriting the FMP," is a "management action" that falls squarely within the "range as defined and analyzed in the FMP." NOAA Operational Guidelines. The MSA, moreover, cabins the Council's discretion by listing 15 provisions that must be included in each FMP, see 16 U.S.C. § 1853(a)(1)-(15), while leaving only unlisted management measures to the Council's judgment.

Finally, CLF notes that the MSA requires FMPs to include measures that "minimize to the extent practicable adverse effects on [essential fish habitat] caused by fishing," 16 U.S.C. § 1853(a)(7), and objects that in this case "all the terrain encompassed within the five areas that [Framework 48] potentially opens to new fishing have been designated as [essential fish habitat]." Reply at 7. Once again, however, CLF's argument runs aground on the express

language of the MSA, which permits Defendants to take the actions that they did. The crucial statutory language here is "to the extent <u>practicable</u>," which, as the First Circuit has noted, does not mean "to the extent <u>possible</u>." <u>See</u> <u>Conservation Law Found.</u>, 360 F.3d at 28. Rather than require Councils to do everything they can to protect essential fish habitat, "by using the term 'practicable' Congress intended rather to allow for the application of agency expertise and discretion in determining how best to manage fishery resources." <u>Id.</u> The Service's regulations adopt this same reading: "In determining whether it is practicable to minimize an adverse effect from fishing, Councils should consider the nature and extent of the adverse effect on [essential fish habitat] and the long and short-term costs and benefits of potential management measures to [essential fish habitat], associated fisheries, and the nation." 50 C.F.R. § 600.815(a)(2)(iii). In other words, just because Framework 48 allows some fishing in essential fish habitat does not mean that it violates the MSA. The Council, moreover, recognized the potential negative impacts of Framework 48 on essential fish habitat, <u>see</u> Framework 48 at 95-109, 447-49, 579-81 (AR 26,136-50, 26,488-90, 26,620-22), and attempted to mitigate them by limiting the closed-area exemptions in order to reduce those impacts, <u>see</u> <u>id.</u> at 60, 62 (AR 26,101, 26,103), and specifying what questions the Service should ask before granting an exemption. <u>See</u> Framework 48 at 450-51 (AR 26,491-92). In sum, because the MSA permits Defendants to balance adverse effects on essential fish habitat against other potential gains, CLF's argument on this point gains no traction.

### 2. *Sufficiency of Defendants' Analyses*

Framework 48 was promulgated pursuant to 50 C.F.R. § 648.90(c), which permits the Service to "at any time, initiate action to add or adjust management measures if it finds that action is necessary to meet or be consistent with the goals and objectives of the NE Multispecies

FMP." Def. Mot. at 11. When proposing such a measure to the Service, a Council must include "an analysis of impacts" that considers the following four factors: (1) whether there is "adequate time to publish a proposed rule, and whether regulations have to be in place for an entire harvest/fishing season," (2) "[w]hether there has been adequate notice and opportunity for participation by the public and members of the affected industry in the development of the Council's recommended management measures," (3) "[w]hether there is an immediate need to protect the resource," and (4) "[w]hether there will be a continuing evaluation of management measures adopted following their implementation as a final rule." 50 C.F.R. § 648.90(c)(3)(i)-(iv).

CLF identifies two main flaws in the Council's analyses here. First, it claims that the Council failed to provide sufficient analysis of how Framework 48 is "consistent with the goals and objectives" of the Northeast FMP. 50 C.F.R. § 648.90(c). Second, it contends that the Council failed analyze how Framework 48 would "advance the protection of the resource," Pl. Reply at 10, a consideration presumably relevant to the third factor listed above.

a. Goals and Objectives

Contrary to CLF's first claim, the administrative record reveals that the Council devoted significant attention to the question of whether allowing sectors access to the closed areas would be consistent with the goals and objectives of the Multispecies FMP. Those goals include: "manag[ing] the northeast multispecies complex at sustainable levels," "achiev[ing] goals of economic efficiency and biological conservation," "[m]aintain[ing] a directed commercial and recreational fishery for northeast multispecies," and "[m]inimiz[ing], to the extent practicable, adverse impacts on fishing communities and shoreside infrastructure." Amendment 16 at 67 (AR 448). As Defendants recount in their Motion, see Def. Mot. at 13-14, the Council's analysis

of Framework 48 included factors such as the size and age of fish caught "inside the proposed exemption areas, inside the closed areas, adjacent to the existing year round groundfish closed areas, and in open fishing areas," Framework 48 at 218 (AR 26,259), the "swept area biomass . . . and abundance" for groundfish species within the closed areas and open areas, id. at 288-321 (AR 26,329-62), the potential effects on fish habitat, id. at 95-109 (AR 26,136-50), and "the performance" of the closed areas "relative to their effects on groundfish fishery productivity." Id. at 363-71 (AR 26,404-12). Having considered these matters, the Council ultimately found that Framework 48 would produce "[a] short-term gain in income . . . but . . . [potentially] a long-term loss in stock productivity." Id. at 424 (AR 26,465). On the Council's recommendation, the Service approved Framework 48, cautioning that while "any access provided to closed areas must be done in a responsible manner," 78 Fed. Reg. at 26,145, "to deny [sectors] any opportunity to fish in the closed areas would unnecessarily limit[] the possibility of providing the fishing industry the opportunity to catch as much fish as possible as long as the long-term health of groundfish stocks is protected." Id. at 26,146.

This balancing of conservation and economic interests is perfectly consistent with both the Multispecies FMP and the MSA. Although CLF emphasizes the conservation-related aims of the Multispecies FMP, the Plan is not aimed exclusively toward environmentalist objectives. In addition to conservation, the FMP also incorporates economic and social goals, requiring, for instance, that the Council "[m]aintain direct commercial and recreational fishery for northeast multispecies," "[m]inimize, to the extent practicable, adverse impacts on fishing communities and shoreside infrastructure," and "[p]rovide reasonable and regulated access to the groundfish species . . . to all members of the public of the United States for seafood consumption and recreational purposes." Amendment 16 at 67 (AR 448). The MSA similarly instructs that

Councils and the Service should "take into account the importance of fishery resources to fishing communities" through "economic and social data" so long as doing so is "consistent with the conservation requirements of this chapter." 16 U.S.C. § 1851(a)(8). Here, both the Council and the Service recognized that Framework 48 pursued short-term economic gains at the risk of long-term conservation costs and ultimately decided that the trade-off was worthwhile. Their decision was not at odds with either the FMP or the MSA, nor was it arbitrary or capricious.

CLF offers a series of critiques of Defendants' analyses on this point, but all of them miss the mark. First, CLF criticizes the supposed economic benefits of Framework 48, noting that the Council described them as "highly uncertain." Framework Adjustment 48 at 505 (AR 26,546). Nevertheless, Defendants' determination that the potential benefits from Framework 48 justified the costs is entitled to deference, and, given the thorough analysis that accompanied their decision, the Court does not believe it to be arbitrary or capricious.

CLF next objects to the Council's "vacuous[]" conclusion, Pl. Mot. at 14, that "the potential for negative impacts on future productivity" will depend on "what specific exemptions are requested and subsequently proposed in future sector operations plan rule(s)." Framework 48 Environmental Assessment Supplemental Information at 3 (AR 26,039). Of course, this conclusion was not vacuous at all, but instead a frank recognition of the reality that the impact of closed-area access exemptions would depend on which exemptions were granted and thus could only be evaluated at that later stage of the process. To account for this unknown, the Council specifically recommended that before the Service could grant any exemptions to the closed-area restrictions under Framework 48, it should review the "impacts of any actual fishing effort" that each specific exemption would cause as well as "the potential for gear conflicts, shifts in fishing effort out of the closed areas, and impacts on protected species and lobsters." Framework

Adjustment 48 at 61 (AR 26,102). The Service, too, emphasized that "[t]he impacts of any actual fishing effort, including the concerns raised in public comments during the development of Framework 48, would be evaluated through the annual review and approval of sector operations plans and exemption requests for each fishing year." 78 Fed. Reg. at 26,131. CLF claims that "[t]here is no way that these later reviews can retroactively satisfy this Groundfish FMP's consistency requirement," Pl. Mot. at 15, but it provides no authority for this proposition, nor does it suggest how the Council could have performed the requisite reviews six months before any exemption had been granted.

Finally, CLF complains that the Council occasionally relied on the ongoing analyses associated with the Omnibus Essential Fish Habitat Amendment. See, e.g., Framework Adjustment 48 at 449 (AR 26,490). CLF claims that the Council should not be permitted to rely on data associated with a review process that has not yet been finalized or approved, but, once again, it provides no justification – let alone citation – for this proposition. The Court sees no reason why such data should be automatically disqualified from consideration.

### b. Protection of the Resource

Easier to dispose of is CLF's claim that Defendants failed to consider how Framework 48 was necessary to "protect the resource." 50 C.F.R. § 648.90(c)(3)(iii). CLF describes this as "the only substantive factor provided for acting under" the authority of § 648.90(c), Pl. Reply at 10, but, as described above, the regulation actually lays out four factors for the Service to consider, with the fifth, overriding one being that the proposed framework adjustment is "necessary to meet or be consistent with the goals and objectives of the NE Multispecies FMP." 50 C.F.R. § 648.90(c)(3). The four subsidiary factors need not all be met under § 648.90(c) for the Service to approve a framework adjustment, and, as already explained, the Service

permissibly concluded that Framework 48 was consistent with the twin economic and conservation goals of the FMP. Even if Framework 48 was not immediately necessary to "protect the resource," the Service was still well within its power to approve the measure.

In sum, CLF's arguments for why Framework 48 violated the MSA all come up empty. The Court will thus deny the group's Motion for Summary Judgment and grant Defendants' on these points.

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant Defendants' Motion for Summary Judgment. Count 1 of CLF's Complaint (the MSA claim), having been decided on the merits, will be dismissed with prejudice. Count 2 (the NEPA claim), having been decided on jurisdictional grounds, will be dismissed without prejudice.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: April 4, 2014